IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DON ANTHONY BELL-JOHNSON,<br><br>Defendant. | Case No. 20-20036-01-DDC |

**MEMORANDUM AND ORDER**

Defendant Don Anthony Bell-Johnson has filed a Motion to Suppress (Doc. 30) asking the court to suppress two firearms that police found in the truck he was driving. Police uncovered this evidence after conducting a K9 exterior sniff of the vehicle, securing a warrant, and searching the truck. The government has filed two Responses in opposition—one before the suppression hearing (Doc. 31) and one after (Doc. 34). Defendant did not file additional briefing after the hearing. For reasons explained below, the court denies Mr. Bell-Johnson's motion.

I.   **Background and controlling facts**

The court held an evidentiary hearing on February 9, 2023, and unless otherwise noted, makes the following factual findings from the evidence presented on that date:[1]

On February 11, 2020, Bonner Springs Police Department (BSPD) Officer Chris Haney received a call from another officer about a 2005 Chevrolet box truck with a suspended, expired California registration sitting on the street near a suspected narcotics residence. Officer Haney

---

[1]   At the hearing, body camera video footage from Officer Gould was admitted as government's Exhibit 6 and additional body camera video footage was admitted as defendant's Exhibits 6, 7, and 8. Kansas City Kansas Police Department Officer Mark Wilcox (K9 Unit Officer) and Bonner Springs Police Department Officer Chris Haney testified. Jerry Potter also testified as defendant's narcotic canine expert witness.

was in the area, so after the officer informed him that a man got into the truck and began operating it on city streets, Officer Haney followed the box truck. He then stopped it for the expired, suspended registration. Mr. Bell-Johnson was driving this truck. Officer Haney explained why he had stopped Mr. Bell-Johnson—suspicious of expired tags and registration— and asked for identification and insurance. Mr. Bell-Johnson couldn't provide proof of vehicle insurance and presented a revoked driver's license. Officer Haney then arrested Mr. Bell-Johnson for driving with a revoked license. Because the truck was parked outside of a suspected narcotics location and because Officer Haney had observed that Mr. Bell-Johnson wouldn't make eye contact with him, Officer Haney called for a K9 Unit.

In the meantime, another officer arrived on scene to conduct a commercial vehicle inspection. Officer Haney testified that he didn't recall precisely which citations were issued at the inspection, but after completing the vehicle inspection, the officer placed the truck "out of service." According to Officer Haney, that means officers would tow the truck because it wasn't road legal. In this situation, BSPD procedures mandate towing an out of service vehicle and conducting an inventory search. Officer Haney testified that even if he hadn't arrested Mr. Bell-Johnson or secured a search warrant for the truck, the truck still would've failed the commercial vehicle inspection. And the officers still would've towed the truck and conducted an inventory search.

### *The K9 Sniff*

About 10 minutes after Officer Haney called for a K9 Unit, Officer Wilcox and drug dog Dax ("the K9 Unit")[2] arrived on the scene. Officer Wilcox led Dax around the truck and instructed Dax to sniff for narcotics. Officer Wilcox testified that he had observed Dax give two

---

[2] The court sometimes refers to Officer Wilcox and Dax as "the K9 Unit" throughout this opinion because they earned certifications and conducted open air sniffs as a unit.

positive alerts—one at the driver's door (when Dax stood and stared at the door) and one at the rear of the truck (when Dax stood and stared).  Then, Officer Wilcox informed the other officers on scene that Dax had alerted to narcotics and returned Dax to the officer's police car.

But Officer Wilcox wrote in his report that Dax had alerted by "sitting at the rear" of the vehicle.  The body camera footage shows that Dax never sat in that location.  Officer Wilcox testified that he made a mistake when he wrote "sat" in the report, but he didn't mistakenly report that Dax had alerted twice in different locations adjacent to the truck.  At the hearing, Officer Wilcox watched body camera footage of the K9 sniff, and identified when Dax had alerted at the rear of the truck.[3]  He also testified that, at this point in the sniff, Dax stood and stared.

When asked why Dax didn't sit to alert, Officer Wilcox testified that the day the K9 Unit conducted the sniff of defendant's box truck, it was cold.  Sometimes, the officer explained, his dog doesn't like to sit on cold ground.  Officer Wilcox also testified that sometimes, Dax stood and stared to alert, sometimes he sat and stared, and sometimes he put his paws up and stared.  No matter how Dax had expressed his alert, Officer Wilcox asserted, he could recognize a positive alert from his dog when he saw one.  The Officer reiterated that Dax had alerted twice near the truck.  He also testified that Dax only needed to make one alert for officers to establish probable cause to search the truck.

### *Officer Wilcox and Dax's Certifications and Training*

Officer Wilcox worked for the Kansas City Kansas Police Department (KCKPD) for 28 years until he retired in 2021.  In 2009, he started working with KCKPD's K9 Unit.  In 2014, Officer Wilcox selected his dog, Dax—a Belgium Malinois breed—from Hill Country Dog

---

[3]    Officer Wilcox identified the alert at the rear of the vehicle at the 31:38-minute mark of Government's Exhibit 6.

Center in Pipe Creek, Texas. Hill Country is a nationally recognized K9 training facility that works with law enforcement and military dogs. Hill Country trained Dax on narcotic detection, then Officer Wilcox joined Dax at Hill Country to train for a month. They logged 160 hours of training, then Dax passed Hill Country's certification. Following that initial certification, the duo returned to Kansas City, Kansas, to continue training. As required by KCKPD policy, Officer Wilcox and Dax next earned certification from the National Police Canine Association (NPCA). NPCA requires an annual certification review. Dax never failed one. Officer Wilcox testified that the NPCA narcotics certification test requires a 75 percent pass rate. Dax always scored 100 percent. Throughout his time with KCKPD, Dax remained in good standing to conduct open air sniffs. He even won a national narcotic competition in the Heartland Trials in 2017.

Officer Wilcox also testified that the KCKPD K9 Unit trained every Wednesday for eight hours. They'd meet with a training group (including officers from KCKPD, and police departments in Lenexa, Shawnee, Bonner Springs, Edwardsville, and Gardner, Kansas). Officer Wilcox and Dax trained for about 32 hours per month. Officer Wilcox testified that the time logged in his training reports reflects the time Dax spent in actual search scenarios—not the whole day spent at the training facility each week.

### *Expert Testimony*

Jerry Potter, a canine consultant, testified as defendant's expert witness. Mr. Potter worked as a narcotics dog trainer for the Department of Defense at Lackland Air Force Base, among other relevant experiences. At the peak of his dog training career, Mr. Potter supervised some 300 dogs in either narcotics or explosives training; and he determined whether dogs were prepared for certification.

4

Mr. Potter reviewed the officer's body camera footage of the K9 Unit's sniff in question and Dax's training and certification records to testify as an expert in this case. During Mr. Potter's testimony, defendant played footage of the search. Mr. Potter opined that he saw three problems with the search, based on video footage capturing it. *First*, the officers on the scene placed items on the rear of Mr. Bell-Johnson's truck, potentially contaminating the scene for the dog. *Second*, the discrepancy between the report—that Dax alerted by sitting—and the video showing that Dax didn't sit in that location. *Last*, when Officer Wilcox determined Dax had alerted at the driver's door, and the sweep concluded, Officer Wilcox didn't reward Dax. Mr. Potter testified that Officer Wilcox's failure to reward Dax was "one of his bigger areas of concern" because, when a dog alerts, the officer should give him his typical reward—such as the dog's toy or "Kong." Mr. Potter speculated that Dax's willingness to walk away from Mr. Bell-Johnson's truck without a reward signaled that Dax didn't expect to get a reward because he actually hadn't alerted.

Mr. Potter also testified that the KCKPD K9 Unit's training records concerned him. Mr. Potter testified that although the National Police Canine Association was a "very good, reputable organization" and that certification was necessary, it wasn't, in his view, the "end all be all." That's so, Mr. Potter opined, because training is a better snapshot of a dog's performance ability than an annual test. He testified that the NPCA recommends 16 hours of training per month, and after reviewing the K9 Unit's records, he believed, for the 2018 through 2020 period, Officer Wilcox and Dax fell far short of this recommendation. He also testified that he found narratives in the training report narratives that Dax consistently would sit or lie down to alert. And Mr. Potter's review of the reports never referenced "stand and stare" as one of Dax's forms of alerting.

Mr. Potter's testimony that Dax *never* stood and stared to alert, based on the narratives in Dax's training records, could raise a concern, given the description of the two alerts at issue here. But, on Mr. Potter's cross examination, the government refuted this premise. Mr. Potter's cross examination revealed dozens of times in the training records where Officer Wilcox recorded that Dax had alerted by "standing and staring." Mr. Potter admitted that "apparently [he] missed some."

### *The Warrant*

Officer Haney testified that he believed he had probable cause to search the vehicle while it was on the side of the road because of the K9 Unit's positive alerts, but he nonetheless proceeded to apply for a search warrant before searching the truck. He decided to apply for the warrant, he explained, because the officers already planned to tow defendant's box truck to the Bonner Springs Police Department, so they weren't in a rush to search it. Officer Haney based his warrant application to the court on the K9 Unit's positive alerts for narcotics.

After the K9 Unit conducted the sniff, Officer Wilcox informed Office Gould of the positive alert; then, Officer Gould relayed this information to Officer Haney at some point during the investigation. Officer Haney had observed the open-air sniff, but he didn't observe it closely, and in any event, he didn't possess the training to determine whether Dax alerted. When applying for a search warrant, Officer Haney relied on Officer Wilcox's determination and report that Dax had displayed a positive alert.

Officer Wilcox conceded that he had made an error in his report about the sniff—he wrote that Dax sat and alerted, but he meant that Dax stood and stared to alert (he realized this mistake after watching video footage). He also testified that he wrote the report based on his

6

best recollection, and that he told the officer on scene that Dax had alerted at the driver's door and the rear of the vehicle. He denied that he had fabricated the alert.

Officer Haney testified that he had no reason to doubt Officer Wilcox's word about the alert. Officer Haney prepared an affidavit for a search warrant application. In it, he described a positive alert by the K9 Unit. Officer Haney testified that he had included this information in the affidavit in good faith. A District Judge from the District Court of Wyandotte County, Kanas issued a search warrant authorizing the truck's search. The warrant authorized officers to search for any forms of methamphetamine, marijuana, cocaine, heroin, and other illegal drug paraphernalia.

### *Motion to Suppress*

After officers secured the search warrant, they searched defendant's box truck and found two firearms. Mr. Bell-Johnson's motion asks the court to suppress this evidence. He argues that the court should suppress the evidence for three reasons. First, he argues, Dax never alerted. Second, and even if Dax had alerted, the K9 Unit's performance was unreliable because of training and certification shortcomings. For those first two reasons, defendant argues, the officers lacked probable cause to search his truck. Finally, Mr. Bell-Johnson challenges the search warrant's validity. He claims that without the false statement in the search warrant affidavit—*i.e.*, that Dax alerted for narcotics inside the box truck—there wasn't enough information to support probable cause necessary to issue the warrant.

The government responds directly to all three of defendant's arguments and, in addition, provides two reasons why the court shouldn't exclude the evidence. The government contends that Dax did alert to drugs, and that the K9 Unit's performance was reliable. Also, the government argues, even if the search violated the Fourth Amendment, the court still shouldn't

exclude the evidence because: (1) the inevitable discovery doctrine preserves the search's fruits; and (2) the good faith exception applies. The court addresses all of these arguments, in turn, below.

## II.  Analysis

The Fourth Amendment forbids unreasonable searches and seizures. *Bailey v. United States*, 568 U.S. 186, 192 (2013). Searches "'conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). If a defendant challenges the reasonableness of a search or seizure, the government bears the burden to prove, by a preponderance of the evidence, the reasonableness of that search or seizure. *See United States v. Matlock*, 415 U.S. 164, 177 (1974); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001). If the court determines the search or seizure violated the Constitution and the law enforcement activity wasn't objectively reasonable, the court, with few exceptions, must suppress the fruits and instrumentalities of the challenged search or seizure. *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014).

### A.  The K9 Alert

#### i.  Did Dax alert?

This issue—whether Dax alerted at all—arose because of the discrepancy between Officer Wilcox's report (stating that Dax sat and alerted at the rear of the vehicle) and the video evidence (showing Dax never sat). The government contends that the report reflected an honest mistake, misrecording the way Dax had expressed his alert—not a mistake whether Dax, in fact, alerted. The defense's expert, Mr. Potter, testified that he didn't believe Dax had alerted because

8

he didn't see the alert on the law enforcement video.  Also, he saw that Dax returned to the car without protesting that Officer Wilcox hadn't rewarded him after the sniff.  Mr. Potter interpreted Dax's behavior to indicate that Dax hadn't alerted.

The government presented body camera footage of the K9 sniff at the suppression hearing, and Officer Wilcox testified that Dax had, in fact, alerted twice during his inspection of defendant's box truck.  So, even though Officer Wilcox mistakenly reported how *one* of the alerts was manifested, the other alert—at the driver's door—on its own established probable cause.  So, this narrow dispute about a second alert is, at bottom, something of a sideshow.

This fact question—did Dax alert at the rear of the truck—is a relatively close call.  But the court finds that the government carried its burden to show that the K9 Unit detected two positive alerts that day through Officer Wilcox's testimony.  And, the government unquestionably proved one positive alert, which would suffice on its own.  Because the court finds two additional, alternative, reasons to deny this motion to suppress, as explained below, it need not spill more ink on a fact question that presents no completely satisfying answer.  The court now turns to the reliability of the K9 Unit's alerts.

### ii.  Were the alerts "reliable" enough to establish probable cause?

Next, defendant argues that the K9 Unit's alerts weren't reliable and thus failed to provide probable cause to search defendant's box truck.  "[A]lerts by reliable drug-detection dogs provide probable cause to conduct a search." *United States v. Villa*, 348 F. App'x 376, 379 (10th Cir. 2009) (citing *United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997); then citing *United States v. Klinginsmith*, 25 F.3d 1507, 1510 (10th Cir. 1994); then citing *United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir. 1993)).  The Tenth Circuit has found that "'a dog alert usually is at least as reliable as many other sources of probable cause and is certainly

9

reliable enough to create a fair probability that there is contraband.'" *Villa*, 348 F. App'x at 379 (quoting *Ludwig*, 10 F.3d at 1527).

"A drug-detection dog's reliability is primarily established by the dog's training and certification." *Id.*; *see also Kennedy*, 131 F.3d at 1378 (ruling that a dog's "reliability should come from the fact that the dog is trained and annually certified to perform a physical skill"). *United States v. Ludwig*, 641 F.3d 1243, 1251 (10th Cir. 2011) ("But the judicial task, we hold, is so limited: to assessing the reliability of the credentialing organization, not individual dogs."). "Although certification alone may be sufficient, the Tenth Circuit has also held that a 70–80% successful detection rate would be reliable." *United States v. Beltran-Palafox*, 731 F. Supp. 2d 1126, 1156 (D. Kan. 2010).

The government contends that the KCKPD K9 Unit's performance on February 11, 2020, was reliable based on the K9 Unit's credentials and training record. The NCPA certified the K9 Unit and it maintained certification for narcotics detection. The K9 Unit trained every Wednesday for eight hours, unless called out to duty. Officer Wilcox and Dax not only met the baseline certification and training requirements; often, they exceeded them. By all accounts, they were a high achieving K9 Unit, accomplished in narcotics detection.

Defendant asserts the alerts weren't reliable based on testimony by its expert, Mr. Potter. Mr. Potter testified that the K9 Unit's alerts were unreliable primarily for two reasons: (1) Officer Wilcox and Dax didn't log enough training hours to meet the national standard; and (2) Officer Wilcox didn't reward Dax after the positive alerts on Mr. Bell-Johnson's truck. The government contested both reasons. Officer Wilcox testified that the time logged in his training reports reflects time that Dax actually devoted to search scenarios—and not the whole day spent at the training facility. So, the government argued, the K9 Unit spent about 32 hours per month

in training—well over the NPCA's recommendation. Officer Wilcox also explained adequately why he didn't reward Dax following the sniff of defendant's truck. He didn't want to give Dax his Kong on a busy street, and, in any event, he didn't always reward Dax to avoid encouraging false positive alerts from his dog. Mr. Potter criticized part of Officer Wilcox's answer. The expert testified that the busy street explanation made sense to him, but he didn't budge on the second point. Mr. Potter persisted in his opinion that the officer always should reward his dog, at least with verbal praise, to avoid extinguishing the desired behavior (alerting to narcotics).

The Circuit's governing legal standard spares the court the need to decide the argument about training hours logged or method of reward. This standard directs district courts in the Tenth Circuit to assess "the reliability of the credentialing organization, not individual dogs." *Ludwig*, 641 F.3d at 1251. Officer Wilcox attested to the legitimacy of the credentialing organization—NCPA—who certified this K9 Unit's reliability. And even, defendant's expert conceded the point, admitting that he wasn't "questioning" that certification and he didn't "have an issue with Dax's certification[.]"

Instead, Mr. Potter testified that he didn't believe that an annual test sufficed to determine the reliability of a K9 Unit. But an annual test is what the NPCA requires. In short, defendant asks the court to side with an expert who doesn't believe (based on his personal experience) that an annual certification suffices and, instead, hold that this K9 Unit's performance was unreliable. To be sure, the expert witness is entitled to his opinion. But defendant can't displace the Circuit's legal standard and replace it with a standard his expert prefers. Officer Wilcox and Dax maintained annual certifications from a reputable national organization—the NPCA. This evidence satisfies all that our Circuit requires. *See id.* In sum, the K9 Unit's alerts furnished probable cause, and despite the mistake in the report, the officers secured a legitimate warrant.

### B. Alternative reasons to admit the evidence

In its Response to Mr. Bell-Johnson's Motion to Suppress, the government argued that the court shouldn't exclude the evidence for two additional reasons: (1) the officers acted in good faith when they executed the search warrant and (2) the officers would've discovered the evidence inevitably because the truck failed a commercial vehicle inspection. In that situation, BSPD's procedure mandated a tow and inventory search on the truck even without the K9 sniff or arrest of Mr. Bell-Johnson.

Defendant never responded to the government's arguments about these two points. At the end of the evidentiary hearing on February 9th, the court asked defense counsel about both the good faith doctrine and the inevitable discovery arguments. Specifically, the court asked if defendant's theory was that Officer Wilcox was simply mistaken when he testified that he saw an alert or if the defendant was arguing something more sinister. Defendant responded that he'd have to reassess his argument about Officer Wilcox after the hearing. The court also asked defendant to address—given the undisputed testimony about officers placing the truck out of service, intending to tow it, and perform the inventory search—defendant's theory why that inevitable inventory search didn't render the commotion about the dog alert and resulting search irrelevant. The court gave the parties simultaneous deadlines to file post-hearing motions. Defendant never filed supplemental briefing. As explained below, both reasons provide independent grounds to deny defendant's Motion to Suppress.

#### i. Good Faith Warrant

The government contends that the officers acted in good faith when they secured and executed the search warrant, and thus the court shouldn't exclude the evidence found in Mr. Bell-Johnson's truck. In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court

established the principle that "the exclusionary rule does not apply in cases where 'the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment.'" *United States v. Esquivel-Rios*, 786 F.3d 1299, 1306–07 (10th Cir. 2015) (quoting *Leon*, 468 U.S. at 918).  Our Circuit has explained *Leon* this way:  Even assuming law enforcement officers have committed a constitutional violation, "improperly obtained evidence remains admissible when the executing agents act with an objectively reasonable good-faith belief that their conduct is lawful or when their conduct involves only simple, isolated negligence . . . ." *United States v. Workman*, 863 F.3d 1313, 1317 (10th Cir. 2017) (citations and internal quotation marks omitted).

To evaluate whether the *Leon* exception applies, the court must "consider whether a reasonably well-trained agent would have known that the warrant was invalid despite the magistrate judge's authorization." *Id.* at 1320 (citing *Leon*, 468 U.S. at 922 n.23).  The court begins this analysis from the premise that the officer in question "'acted in good-faith reliance upon the warrant.'" *Id.* (quoting *United States v. Campbell*, 603 F.3d 1218, 1225 (10th Cir. 2010)).

Starting here, from that premise, the court finds that the *Leon* exception applies to the warrant Officer Haney secured.  The evidence establishes and the court finds that Officer Haney made a good faith decision to apply for a warrant.  He had no reason to doubt Officer Wilcox's word—that Dax had alerted to narcotics.  Officer Haney acted in good faith reliance on Officer Wilcox's statement when he applied for a warrant.  A state court judge found the application sufficient and issued the warrant.  Officer Haney then acted in good faith when he relied on the warrant and executed a search of Mr. Bell-Johnson's truck.  Officer Haney, in both instances, acted with an "objectively reasonable belief" that his conduct didn't violate the Fourth

13

Amendment. *See Esquivel-Rios*, 786 F.3d at 1306–07. Defendant presented no evidence to the contrary. Thus, the court concludes that even if the warrant was issued in error, a *Leon* exception applies. The evidence derived from the search it authorized remains admissible even if the arrant was issued erroneously.

### ii. Inevitable Discovery

Finally, the government argues, even if the truck's search violated Mr. Bell-Johnson's Fourth Amendment rights, the court should not suppress evidence derived from the search. The government contends that the inevitable discovery doctrine applies. The court agrees, and thus denies defendant's motion for yet another reason.

Under this doctrine, evidence acquired in violation of the Fourth Amendment "need not be suppressed if agents inevitably would have discovered it through lawful means independent from the unconstitutional search." *United States v. Loera*, 923 F.3d 907, 928 (10th Cir. 2019) (citing *Christy*, 739 F.3d at 540). These two cases, among others, explain how the doctrine works.

> The government is required to prove by a preponderance of the evidence that the unlawfully-obtained evidence would have been discovered through lawful means. The "lawful means" need not be a second, independent investigation. Rather, the inevitable discovery doctrine will apply if there was "one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal."

*Id.* (quoting *Christy*, 739 F.3d at 540) (emphasis omitted). To determine whether a lawful "line of investigation" inevitably would have led to securing the vehicle's search warrant, the court must "place the government officers in the 'same positions they would have been in had the impermissible conduct not taken place,'" and "'ask whether the government would have

14

inevitably discovered the evidence lawfully.'" *Id.* (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984)).

The government asserts that once the box truck failed the commercial vehicle inspection, officers inevitably would've towed it and conducted an inventory search. Officer Haney supplied the requisite factual foundation for this argument. The evidence presented at the hearing established that a commercial vehicle inspection officer found that Mr. Bell-Johnson's truck was inoperable and BSPD procedures mandated towing it as an out of service vehicle.[4] Officer Haney testified that even if he hadn't arrested Mr. Bell-Johnson or secured a search warrant for the truck, the officers still would've towed the truck and thus conducted an inventory search. Thus, officers would've discovered the guns in the truck through a separate lawful process.

---

[4] While Officer Haney's testimony established that Mr. Bell-Johnson's truck failed a commercial vehicle inspection, Officer Haney couldn't recall exactly which citations the commercial vehicle inspector issued. The government didn't present any additional testimony on the issue at the evidentiary hearing. But the government's Response asserted the following reasons for placing the truck "out of service": defendant drove with a revoked license; he operated the vehicle without a valid medical certification; he didn't have a USDOT registration or proof of a periodic inspection; the truck lacked warning devices, a fire extinguisher, and operable clearance lamps; defendant operated the vehicle without valid insurance; and finally, defendant operated the vehicle without operating authority. Doc. 31 at 12.

It's easy to imagine more conclusive proof that the truck violated the relevant policy and required a tow and inventory search—*i.e.*, testimony from the officer who conducted the inspection or relevant BSPD policies admitted into evidence as exhibits. But the burden of proof doesn't require the government to marshal the best evidence. And the government presented some evidence—Officer Haney's testimony—that supported this conclusion. The standard on this motion is preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 178 (1974) ("the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence"). Preponderance of the evidence means "more likely than not." *Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1337 (10th Cir. 2017). Defendant, even when invited by the court to present evidence or legal theory contradicting the government's position on inevitable discovery, provided none. Thus, the court finds that the government's testimony suffices to show—by a preponderance of evidence—officers would've towed Mr. Bell-Johnson's truck and conducted an inventory search of it.

Based on Officer Haney's credible testimony, the court finds that officers would have discovered the evidence inside the truck inevitably. This line of investigation—the tow and inventory search—inevitably would've led to uncovering the evidence by independent lawful means. If the officers were in the same positions without the allegedly impermissible conduct, the warrant search, they would've towed the truck and searched it lawfully. Even when invited by the court to do so, defendant presented no evidence or argument explaining why this theory didn't apply. Thus, the court concludes, the inevitable discovery exception also applies to admit this evidence. *See Loera*, 923 F.3d at 928 (evidence "need not be suppressed if agents inevitably would have discovered it through lawful means independent from" an allegedly unconstitutional search).

### III.   Conclusion

No matter the path taken to get there, the court reaches the same conclusion—it shouldn't exclude evidence found in the truck Mr. Bell-Johnson drove on February 11, 2020. To safeguard individual rights, courts "crafted the exclusionary rule, under which evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *Estate of Taylor v. Salt Lake City*, 16 F.4th 744, 753 (10th Cir. 2021) (emphasis omitted) (internal citation and quotation marks omitted). The rule's "'prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.'" *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). But the exclusionary rule—often by excluding reliable, trustworthy evidence—imposes costs on the judicial system and society at large, and thus courts must apply it only "'where its remedial objectives are thought most efficaciously served.'" *See id.* (quoting *Calandra*, 414 U.S. at 348). The record here doesn't contain any evidence of

unlawful police conduct in this case.  Thus, for reasons explained above, the court denies Mr. Bell-Johnson's Motion to Suppress (Doc. 30).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Don Anthony Bell-Johnson's Motion to Suppress (Doc. 30) is denied.

**IT IS SO ORDERED.**

Dated this 17th day of March, 2023, at Kansas City, Kansas.

                                      <u>s/ Daniel D. Crabtree</u>
                                      **Daniel D. Crabtree**
                                      **United States District Judge**